## Boults et al. *versus* Mitchell.

1. Trespass will lie against one who enters on land by authority of law, for exceeding his authority after entry; but it will not lie against one who has entered under a contract with the owner, for an injury done to the premises, before the term of consent has been determined.

2. Where a right of entry on land for the cutting and removing of timber has *determined*, trespass *quare clausum fregit* may be maintained by the owner of the land and timber against the person who had such former right of entry, for cutting trees thereon, and the value of the trees cut and removed may be recovered: but if the right of entry be *not* determined, such action of trespass cannot be maintained.

3. Where a conveyance is made to a person of all the timber on a tract of land "that is suitable for rafting and sawing," the right is from its nature determinable; and if the party refuse to exercise his right in a reasonable time, after notice to do so, the right will be terminated, and the privilege of entry gone.

ERROR to the Common Pleas of *Wayne County.*

This was an action of trespass *quare clausum fregit.* Summons issued December 7, 1847.

The declaration in this case sets forth that the defendants on the 1st day of January, 1844, and on divers other days and times before the commencement of this suit, with force and arms, &c., felled, cut down, prostrated, and destroyed the trees and pollards, (naming the different kinds and value of the whole, and describing the land upon which they were cut, &c.,) and carried away the same, and converted and disposed them to their own use.

And also then and there cut down, prostrated, and destroyed the trees and underwood, (describing the same, and the kinds and quantities thereof, and the value, but omitting the description of plaintiff's land,) and took and carried away and converted and disposed thereof to their own use.    Claiming as damages $2000.

To this declaration the defendants plead not guilty, with leave to give the special matters in evidence.

The cause was tried, February 8th, 1849, before the Hon. WM. JESSUP.

On the trial, the plaintiff and defendants claimed title to the timber and trees in question from the same source, to wit, Abraham and Stephen Mitchell.    The paper title was the same as is stated in the case between the same parties immediately preceding this case. See *antea,* page 364.

Isaac Mitchell, the *plaintiff,* sought to maintain his title upon two grounds:—

1st. A deed of Abraham and Stephen Mitchell and wives to him, dated 28th April, 1846, conveying 147 acres in Damascus, "excepting and reserving therefrom all the timber that is suitable for rafting and sawing of every description—said timber having been sold with Lukens's mill-lot."

[Boults et al. *v.* Mitchell.]

2d. A parol gift or sale' from said Abraham and Stephen Mitchell to him, as early as 1830, accompanied with a delivery and retention of possession from 1831, and with the making of improvements, reserving only the timber that was *then* suitable to saw. Stephen Mitchell was examined, and testified to a contract made between him and Abraham before the parol gift to plaintiff, that he (Stephen) was to have the land and undergrowth, and Abraham was to have the saw-mill and the timber suitable to saw.   See his testimony.   *Also, notice given by plaintiff to Cornelius Boults, in August, or early in September,* 1847, *to take off what timber he had on plaintiff's land, in two months.*

The plaintiff insisted that he was entitled to all the growth of timber from 1830 or '31—that if the timber was not *then* suitable for sawing, although it became so afterwards, the defendant was not entitled to it.

On the part of the plaintiff was given in evidence:—Deed, 28th April, 1846; from Abraham and Stephen Mitchell and wives to Isaac Mitchell, the plaintiff, conveying 147 acres of land in Damascus; excepting and reserving therefrom all the timber that is suitable for rafting and sawing of every description.   Said timber having been sold with Lukens's mill-lot.   Special warranty.

Deed 21st April, 1835, from Abraham and Stephen Mitchell and wives to *John N. Lukens,* conveying 101 acres, reserving to said Abraham Mitchell the right of taking off said lot all timber suitable for sawing.

Deed 20th June, 1838, from Abraham Mitchell and wife and Stephen Mitchell to Moses Thomas, conveying to the said Moses Thomas, his heirs and assigns, land in Damascus containing 10 acres, and saw-mill and buildings thereon, (except the grist-mill,) and conveying also to the said Moses Thomas, his heirs and assigns, all the timber on the lot of which this is a part, "that is suitable for rafting and sawing, of every description," it being the lot purchased by Mitchells, of Thomas Shields' part of Damascus manor, containing 350 acres.   The above purchase of timber is understood to include the timber on the lot leased to Enoch Owen and the part of the above sold to John N. Lukens.   To have and to hold &c., to the use, &c. of Moses Thomas, his heirs and assigns for ever. Special warranty.

Evidence was given on the part of the plaintiff as to the taking of the timber, its quality and value, the size of the trees, and as to what sizes of trees it had been usual to saw or raft and run to market.

Stephen Mitchell testified:—Isaac Mitchell is my brother.   Before 1830, Isaac had a promise of the land.   I told him he might have it.   I promised to give it to him at a nominal price, to make the deed good.   There was no writing.   Not long after that, he went into possession.   He made improvements right away.   I gave

[Boults et al. *v.* Mitchell.]

him a deed in pursuance of this verbal agreement. Before that, Abraham and I had made a verbal trade. I was to take all the timber that was less than the saw-timber. Isaac took it the same as I had with my brother Abraham. I made the reserve when I first traded. The timber was still reserved to brother Abraham. The agreement was among all of us. Reservation no more than such as was suitable to saw. Eighteen inches was the usual smallest size. Eighteen and upwards was rafting timber.

Cross-examined :—I took the land and undergrowth, and Abraham took the timber and mill. All the timber that was then suitable for sawing and running down the river belonged to Abraham. I paid him $700 to boot. My brother had the mill, ten acres of land, and said timber. It extended to rising 400 acres. Might pick up and make out a couple of farms. Lukens 100 acres good. Now one-third of the 147 acres might be tillable. I have 100 acres pretty good. Lukens had another 50 acres. The land cost Lukens three or four hundred dollars.

William Gavott testified that he cut and culled all the timber on the lot fourteen or fifteen years ago. In 1838, he culled the timber on the lot as far as he went—he went over two-thirds of the lot of 147 acres. That timber was cut by direction of Boults which was not of suitable size for *sawing and rafting*. Cut in the southeast corner of the lot.

The defendant Boults claimed title to the timber as follows :— By deed dated 20th June, 1838, by Abraham and Stephen Mitchell to Moses Thomas, conveying 10 acres of land and all the timber on a lot of land of 350 acres, (of which the 147 acres were a part,) *that is suitable for rafting and sawing* of every description.

Deed, 1st November, 1841, Moses Thomas to John N. Lukens conveying the said 10 acres, and conveying all the timber suitable for *rafting* of every description on said lot of 350 acres, reciting that said 10 acres, with the timber above mentioned, was conveyed by the deed of Abraham and Stephen Mitchell to Moses Thomas, &c.

Agreement, 5th September, 1846, John N. Lukens with Cornelius Boults, agreeing to convey said 10 acres and also the timber *suitable for sawing of every description*, being on the lot of land owned by Stephen Mitchell, containing about 100 acres, *and on the lot owned by Isaac Mitchell, containing about* 147 *acres*, being parts of the same lot of which the aforesaid 10 acres are a part, which said lot was purchased by Stephen Mitchell and Abraham Mitchell of *Thomas Shields*, (viz. the tract containing 350 acres:) Boults agreeing to pay $900, with interest from the date.

JESSUP, J., charged the jury as follows :—

The rights of the plaintiff are defined by the deed to him of S. and A. Mitchell, dated 8th April, 1846. It is true that the evidence shows that the plaintiff was in possession of the land, and had

2 G

cleared some of it, from about the year 1831, under some under-standing that he should have it; but there is nothing which clearly defines the bargain between them; and as there is no allegation that the defendant cut any timber, for which this suit is brought, *prior to that deed*, any consideration of the rights of the plaintiff prior to the deed are not material.   Nor is it material to inquire about the previous understandings, because, whatever they may have been, they were merged in the deed, and the parties are bound by the extent of the grant, and of the limitations and reservations in that deed.   This is the general rule, and there is nothing in this case which should make it an exception.   The rights of the plaintiff being concluded by the deed, there being nothing ambiguous and nothing requiring explanation, it is for the court to give construc-tion to the reservation therein contained.

We inquire then, what are the rights of the plaintiff to this timber, and when did those rights attach?

The exception in the deed is in these words :—" Excepting and reserving therefrom all the timber that is suitable for rafting and sawing of every description, said timber having been sold with the aforesaid Lukens's lot."   The deed conveys the land subject to the right of timber thus reserved.

The plaintiff claims that this reservation is applicable only to such timber as was suitable for sawing or rafting in 1835, when the first reservation was made in the deed to Lukens.   But this is evidently a misapprehension, because that was a reservation of the timber on Lukens's lot of 101 acres, which A. and S. Mitchell con-veyed to him, and has nothing to do with this case.   The reference in the deed is probably to the conveyance of the ten acre lot and timber to Moses Thomas, on the 20th June, 1838, under which the defendant justifies; and the question here is, whether the deed is to be construed as reserving only the timber which passed by the grant to Moses Thomas.   That it is not, will appear by the follow-ing considerations :—

1st. The reservation is in the present tense, and clearly is to be taken as of the date of the deed.

2d. It is specific in its terms as to the kind of timber reserved.

3d. The reference to the fact that the timber had been sold, cannot control the express reservation in the clear terms in which it is expressed.   Upon this part of the case, the court instruct the jury that the plaintiff had not a right, on the 8th April, 1846, to any timber then suitable for sawing and rafting.   The right to enter and take away such timber was in Stephen and Abraham Mitchell, or in their vendee, if before that time they had or there-after should dispose of that right.   The defendants set up title to the timber under the conveyance of S. and A. Mitchell to Moses Thomas of the timber suitable for sawing and rafting, dated 20th June, 1838.

[Boults et al. *v.* Mitchell.]

Thomas conveyed to John N. Lukens on the 1st November, 1841, and he conveyed to defendant on 6th September, 1846.

The plaintiff alleges that the defendant has taken timber not suitable for rafting and sawing on the 20th June, 1838, or even at this time, and some evidence has been offered on this subject. The question is, who was to be the judge of the fitness of the timber for those purposes? It is believed that the terms "sawing and rafting" embrace all kinds of timber (this being a lumbering country) which might be manufactured, or which might be run to market on the river without being manufactured.

In cases of this description, the grantee is entitled to the election, and such timber as he may deem suitable to saw or to raft he may properly take. He may not exercise any wantonness in this election, but he may choose such timber as, in his own opinion, will answer his purpose to use for sawing or rafting. He cannot cut hoop-poles, nor fire-wood, nor maliciously or wantonly cut down or destroy timber not suitable for rafting and sawing: but, acting in good faith, the judgment of the grantee is to govern as to the kind of timber for those purposes which he would use. When A. and S. Mitchell made the conveyance to Moses Thomas, the right of election was in him. When Thomas conveyed, if the election had not been made, the same right passed to his grantee, and so down to Boults, the defendant. When the election was once made, the right of the grantee of the timber was ended, and what remained belonged to the owner of the soil.

There is in the deed no limitation of time during which this right of election should be exercised, and, therefore, the grantee might be put to it in a reasonable time by the requirement of the grantor. Such a demand to make his election, would require the grantee to get off his timber in a reasonable time thereafter. In deciding what is a reasonable time, reference should be had to the season of the year, the quantity of timber, and its proximity to the saw-mill or the river. It is not competent for the grantor, in an arbitrary notice, to limit the time. A reasonable time after notice is to be extended, and what is a reasonable time is to be determined by the jury.

The right of Boults is defined by the deed to Moses Thomas, under whom he holds. It is of the timber suitable for rafting and sawing on the 20th April, 1838. It could not be extended to timber which, by its growth after that time alone, had become fit for sawing and rafting. Isaac Mitchell, the plaintiff, took subject to a reservation of the timber suitable for the same purposes, in 1846. The timber which had grown between those periods, so as to be suitable for those purposes, would belong to A. and S. Mitchell. But of this, Boults cannot take advantage.

Isaac Mitchell, as the owner of the land, could protect the timber thereon as against any person not having a right of election. That

[Boults et al. *v.* Mitchell.]

right, as to timber growing after 1838, being in A. and S. Mitchell only, Boults could claim no benefit therefrom. He could justify an entry on the land to take *his own timber*, but not an entry to take timber *which he had no right to cut.*

This is an action of trespass *quare clausum fregit,* and may well be sustained if Boults entered to take any timber to which, under his grant from Lukens, he was not entitled. It was not for him to say that A. and S. Mitchell would ever elect to take any timber. That could only be determined by them when they should be put to an election.

It has been suggested by the plaintiff's counsel that this reservation is repugnant to the deed, and therefore void. But this is not its effect. It defeats not the grant—it only diminishes the amount of the estate passed by it. Such reservations are of everyday occurrence and are valid.

The defendant's counsel have raised the point, that as Boults had a right to enter the land to take the timber in his reservation or grant, no action of trespass can be sustained against him, even if he took timber to which he was not entitled. This is already answered in the negative. A right to take one kind of timber cannot justify an entry to take a different kind.

To this charge both parties excepted.

Verdict for plaintiff, for $40.67.

On the part of the defendants below, error was assigned to that part of the charge of the court which sustains in substance the following positions :—

1st. That upon the demand of the plaintiff, the defendant is compelled to take off the timber in a reasonable time, to be determined by the jury, making no distinction whether the land be tillable and necessary for agricultural purposes, or mountainous or swamp lands which might never be needful for the plaintiff's use.

2d. That the right of Boults is confined to timber suitable for rafting and sawing on the 20th April, 1838, and could not be extended to subsequent growth : and that, although plaintiff was not entitled to the growth of timber between the times of defendant's deed of 24th April, 1838, and plaintiff's deed of 1846, yet the said plaintiff, "as owner of the land, could protect the timber thereon as against any person not having the right of election." That right, as to timber growing after 1838, being in A. and S. Mitchell only, Boults could claim no benefit therefrom. "He could justify an entry upon the land to take his own timber, but not an entry to take timber which he had no right to cut." That as to this, action of trespass "may well be sustained."

3d. That if Boults took timber to which he was not entitled, the action of trespass can be sustained.

The case was argued by *Mallery,* for plaintiffs in error.—It was

[Boults et al. *v.* Mitchell.]

established in The Six Carpenters' case, 8 *Coke* 290; 1 *Smith's Lead. Ca.* *62, that if a man abuse an authority given him *by law*, he becomes a trespasser *ab initio*—contra of an authority given by the party.

The defendant claims under the deed of June 20th, 1838, by A. and S. Mitchell to Moses Thomas, conveying, *inter alia*, to said Thomas, all the timber on plaintiff's lot "that is suitable for rafting and sawing of every description."

This was before the conveyance of the soil to the plaintiff, by the said A. and S. Mitchell, which was April 8th, 1846, in which conveyance there is an express exception and reservation of all the timber that is suitable for rafting and sawing of every description. The defendant takes the soil with notice of the prior grant of the timber.

A conveyance of the timber conveys an interest in the land itself, or a right of soil in the close, so far as it may be necessary for the support and nourishment of the trees: 4 *Mass.* 266, Clapp *v.* Draper; 1 *B. & A.* 622; 20 *E. C. L. R.* 458. The grant to defendants below was of the timber suitable for sawing, without limitation as *to time*. See 1 *Maine* 122.

Neither party has an exclusive right of soil and of entry, and where the right of the plaintiff is *not exclusive*, he cannot maintain trespass: 4 *Mass. Rep.* 276, Clapp *v.* Draper; 3 *Burr.* 1824.

*F. M. Crane* for defendant in error.—Moses Thomas had cut in 1838 and drawn from the 147 acres all the large timber, except a small quantity on the south-east corner of the tract. In 1847, Boults cut over the same part of the lot that had been culled by Thomas in 1838.

It is contended by defendant's counsel that Boults had no right to any timber on such part of the tract as had been cut over *by any previous holder of the grant.*

The deed to Isaac Mitchell, in 1846, contains a reservation to *Stephen* of all the "timber suitable for rafting and sawing, the same having been sold with the aforesaid Lukens's mill-lot," which was held by the court to refer to the deed to Thomas in 1838. See charge.

Now, what is the effect of this reservation? Stephen Mitchell, by the agreement with his brother Abraham in 1830, became the owner of the *small* timber, and right of soil to 350 acres, and, as early as 1831, sold to Isaac 147 acres. Isaac took possession and continued to occupy it.

Moses Thomas made his purchase of mill-seat in 1838, together with the timber *then suitable for rafting and sawing.*

Isaac's receiving his deed in 1846, referring to the deed to Thomas, may estop his going back of that time, but the reservation to Stephen in Isaac's deed, cannot affect Isaac in this suit, he

having, so far as his brother was concerned, been long the owner of the very privilege reserved. It cannot be said that any one but Isaac was the owner of the undergrowth not included in the deed to Thomas.

Moses Thomas had but an easement in the land, and had he, in 1838, selected the timber that was suitable for rafting and sawing on the entire tract, all right under his deed would have been ended. It was not intended that he was to have all the growing wood on the land, but only the timber suitable, in 1838, for rafting and sawing. The *reservation* in the deed to Isaac, the plaintiff, is of such timber as was sold to Moses Thomas in 1838, and the action lies as much as if no easement had existed. Isaac was in possession, and can maintain trespass: 2 *P. A. Browne* 109, Shenk *v.* Mundorf; 4 *Yeates* 218; 1 *Shep. Touch.* 193; 2 *Barr* 291; 4 *Mass.* 266, Clapp *v.* Draper.

The opinion of the court was delivered March 31, 1851, by

BELL, J.—As already said, in the action of replevin between the same parties, in which the opinion of this court has just been given, we think the construction, by the court below, of the clauses of reservation in the several deeds read on the trial, is correct, for the reasons given in the charge, and those adduced in the opinion referred to.

On the trial of the replevin, both Abraham and Stephen Mitchell testified as witnesses, and, under oath, disclaimed any right to the trees which matured as sawing and rafting timber, subsequently to the conveyance to Moses Thomas, in June 1838. Each conceded the existence of the executed parol agreement of 1828, set up by the plaintiff, concurring that the deed of 1846 was intended to carry that agreement into effect, and, therefore, acknowledged the property of the trees which attained their growth as timber, technically speaking, after the year 1838, to be in Isaac, the plaintiff. Under this proof, Mr. President ELDRED instructed the jury that, in a contest with a stranger to the deed of 1846, and who can claim only timber which had perfected in 1838, the plaintiff might fairly assert a title to those trees which, by natural growth, became fit for the saw or raft between the two given dates. Any dispute on this point must, necessarily, be between the three brothers; and where both Abraham and Stephen repudiate any supposed right, it is not perceived how a third person, deriving no interest under the deed of 1846, can set it up as conclusive against the grantee. The rule which merges prior negotiations and agreements in an after-executed conveyance, was established for the protection of the parties to it, or others affected by it. But when these refuse to take shelter behind the rule, and freely acknowledge an earlier arrangement as that intended to be made effective, there would seem to be no reason why the rule should be insisted on.

[Boults et al. *v.* Mitchell.]

In the case immediately before us, however, Stephen Mitchell was alone examined, and although he speaks of the deed of 1846 as given in pursuance of the prior verbal agreement, yet, as the other grantor was not introduced, the case was left to proceed upon the several conveyances, unaffected by prior arrangements. Under this state of facts, the defendant contended that, as he had a right to enter upon the plaintiff's land under the grant of 1838, he could not be converted into a trespasser *ab initio* by merely felling trees to which he had no right, and, consequently, trespass would not lie at the suit of the owner of the soil, having no interest in the trees taken. But the court instructed the jury that, though the defendant might justify an entry on the plaintiff's land to take timber to which he was entitled, he could not enter to fell trees to which he had no claim; and, though the property in the timber improperly taken was in Abraham and Stephen Mitchell, the plaintiff, as owner of the land, might, in this form of action, protect the timber against all but the true owners. From the generality of this instruction, the jury must have been led to the conclusion that, though the defendant's right of entry to take timber belonging to him is undoubted, yet if he felled a tree not his own, he became liable to answer as a trespasser. To this proposition, thus broadly put, we cannot assent. Indeed, in a country where the sale of growing timber, as a distinct thing, is very common, and essential to general improvement, the operation of such a doctrine would be highly inconvenient, if not intolerable.

The grant of timber proper for rafting and sawing conferred on the grantee and his assigns, not only the right to enter upon the land for the purpose of cutting and removing suitable timber, but, also, to select and judge of its suitableness. A license to do an act, necessarily implies every privilege essential to the enjoyment of the principal thing, and in 1 *Saund.* 322 *a*, our very case is put in illustration of this principle. "If," says the book, "there be in a grant an exception of the trees, the lessor has a power incidental to it, to enter, fell, and take away the trees." The right of entry being ascertained, we are at once brought in view of the principle that a mere abuse of this privilege does not involve the commission of a trespass. The distinction established by the Six Carpenters' case, 8 *Coke* 290; 1 *Smith's Lead. Cases* 62, and ever since recognised, is between an authority conferred by law, and one granted by an individual. An excess in the exercise of the former converts the *tort feasor* into a trespasser, but an abuse of the latter works no such effect. Undoubtedly, one injured by the latter misfeasance, has a remedy for the vindication of his violated right, but that remedy is not by action of trespass *quare clausum fregit*, which is grounded upon a tortious breach. Nor, in a case like the present, can any but one having an interest, general or qualified, in the thing converted, maintain trespass for its asportation. It

follows from this, that whether this be regarded as an action for breach of the plaintiff's close, under the first count of the narr., or, under the second, simply for removing and converting the prostrated timber, it is equally unsustainable.

If the respective rights of the parties be regarded from another point of view, the result is alike unfavorable to the plaintiff. Thus, it is said that a grant of growing timber, by necessary implication carries also a right in the soil in which the trees are growing; at least, so far as may be necessary for their support and nourishment. Under the term " wood," used as synonymous with the Latin word " boscus," not only the trees, but the soil upon which they are, will pass; and where there was a lease of a manor, " always excepting the wood and underwood," it was held that the soil itself was excepted; but where the grant or exception is of timber-trees, no soil passes or is excepted but so much as is necessary for the nutriment of the granted trees: Whistler *v.* Parslow, *Cro. Jac.* 487; Leigh *v.* Heald, 1 *Barn. & Ald.* 622. Or, as it was said in another place, the grantee of the trees has "an interest in the soil for a particular use:" Clapp *v.* Draper, 4 *Mass.* 266; he is entitled "to sufficient nutriment out of the land to sustain the vegetative life of the trees, for without that the excepted trees cannot subsist:" Liford's case, 11 *Rep.* 49. To the same effect is Tucker *v.* Andrews, 1 *Maine Rep.* 122, where it was held, that by a conveyance reserving all the pine timber of a particular size, the trees remain the property of the grantor, with so much soil as is necessary to support them. From these ascertained principles, it would seem to follow that the owner of growing trees has, technically speaking, an interest in the close where they are situate; for close does not so much mean an enclosure as an interest in the land itself. It was, accordingly, decided in Rolls *v.* Rock, 2 *Sel. N. P.* 1287, that where trees are absolutely excepted in a lease, the land on which they grow is, necessarily, excluded also; consequently, if the tenant cut down the trees, the landlord may maintain trespass for breaking and entering his close and cutting down his trees; the landlord's possession being, in legal contemplation, exclusive. But where this species of implied interest and possession is not exclusive, but of a mixed character, as where the grant or reservation of growing trees is not general, but partial, in common with others, or where, perhaps, it is but for a limited period, determinable on the expiration of that period, trespass will not lie by one of the parties in interest against another. This difference is noticed by the Supreme Court of Massachusetts, in Clapp *v.* Draper. It was an action *quare clausum fregit*, brought by the owner of the trees against the owner of the soil. The court say, " Upon looking over the cases, we are satisfied that the plaintiff, having an inheritance in the trees and an *exclusive* right of soil in the close, as far as it was necessary for their support and nourishment, may main-

[Boults et al. *v.* Mitchell.]

tain trespass for breaking the close, as well as for cutting the trees. It appears to be a principle of law well settled, that where a man has a *separate* interest in the soil for a particular use, although the right of soil is not in him, if he be injured in the enjoyment of his particular use, trespass *quare clausum fregit* lies, but not if his interest is in common with others." In the case before us, there is a species of mixed ownership. The plaintiff, under his deed of 1846, claims the ownership of the soil and an interest in some of the growing trees, while the defendant, under the conveyance to Thomas, avers his ownership of, at least, a portion of the timber-trees, and an interest in the soil consequent upon it. We are thus presented with a species of tenancy in common, or, at least, a community of constructive possession, which would seem to forbid the assertion by either of the parties of a breach of his close by the others. Such appears to be the doctrine of the cases upon this and analogous rights and interests.

Of course, what has been said proceeds on the ground that the defendant might, with some show of reason, still assert the existence of timber to which he might be entitled at the time of his entry. If all the timber contemplated by the grant of 1838 had been unquestionably removed before the entry now sued for, by either the defendant or those under whom he claims,—of which there is some appearance of allegation in the paper-book,—and this was known to the defendant, the entry was without authority. The grant was in its very nature determinable ; the right to cut timber was not to continue for ever, at the pleasure of the grantee and his assigns; and if, from the destruction of the trees, the subject of it, or the refusal of the party to exercise his right after a reasonable notice to do so, the right itself is determined, the privilege of entry is gone with it, and the owner of the land may sue for a breach of close, though he may not recover, in damages, the value of trees taken, the property of which is not in him.

In the event already pointed to, of a disclaimer of all property in the trees by Abraham and Stephen, the plaintiff may recover the value of such trees, improperly cut and converted, under the principles already adverted to. But if, at the time, there was a right of entry in the defendant, some other form of action must be adopted to vindicate the property of the plaintiff and to enable him to recover the value.

The doctrine of the court below on the subject of notice is indisputable. If it were not so, the grantee might claim to enter upon the lands on which the trees grow, for an indefinite period of time, and, by refusing to remove the timber, entirely defeat the culture and improvement of the soil. Such a power is unreasonable, and certainly was not intended to be conferred by the deeds. But it is unnecessary to add further to what has been already said on this subject.

[Boults et al. *v.* Mitchell.]

What has been said results in this:—If, under the principles adverted to, the defendant's right of entry was determined, trespass for breaking the plaintiff's close may be maintained; and in that form of action, the value of the trees which matured since 1838 may be recovered, provided Abraham and Stephen Mitchell repudiate all ownership of them, conceding them to belong to the plaintiff by virtue of the agreement of 1828; otherwise the measure of damages is the value of the trees cut, if any, which do not belong to Abraham and Stephen.

But, if the defendant's right of entry be not determined, trespass *quare clausum fregit* cannot be sustained against him.

Judgment reversed and a *venire de novo* directed.